**Alfred M. DAVIS, Appellant,**

v.

**Mrs. W. H. HOWARD, Appellee.**

**No. 11642.**

Court of Civil Appeals of Texas.

Austin.

Dec. 18, 1968.

---

John R. Duren, Copperas Cove, for appellant.

Verne J. Philips, Austin, for appellee.

HUGHES, Justice.

This proceeding is brought under the provisions of Rules 717–736, Texas Rules of Civil Procedure, Trial of Right of Property.

The procedural aspects of this case arise from these facts:

On July 6, 1965, appellant, Alfred M. Davis, obtained a judgment in Cause No. 144,428 in the court below against Ralph Arave in the sum of $2,466.25.

On August 24, 1966, under a writ of execution issued on the Arave judgment in the trial court the Sheriff of Travis County levied such writ on a number of horses as the property of Mr. Arave.

On September 7, 1966, appellee, Mrs. W. H. Howard, filed a claimant's affidavit and bond under Rules 717–719, T.R.C.P. by which she claimed and received from the Sheriff certain of the horses and colts upon which the Sheriff had levied. The value of these animals was assessed by the Sheriff at $2,500.00.

On October 3, 1966, a default judgment was rendered for appellant and against appellee and the sureties on the claimant's bond filed by her.

On October 24, 1966, appellee filed a sworn motion to vacate the default judgment in which she alleged:

"That on said day, [October 3, 1966] the same being the first day of the first term after the bond and affidavit of defendant was filed under RCP 717, defendant by her attorney appeared and found that the Office of Judge of the 126th District Court was vacant and he was not notified that the duly elected and qualified Judge of the 167th District Court was going to hear this matter filed in the 126th District Court.

II.

Any default judgment against the defendant is improper and void, prior to the court directing the tender of issues under RCP 726. The plaintiff in this cause made no written appearance and caused no notice to be given defendant and this defendant did not fail or refuse to join issue with plaintiff and since there were no issues tendered by plaintiff or the court defendant was not in default.

Therefore premises considered, defendant prays the judgment theretofore entered against her be set aside and the plaintiff be required to properly plead his cause where defendant shall have the opportunity to join issue."

This motion was granted on the date on which it was filed.

Thereafter, pleadings were filed by both parties and the issues presented were tried on their merits. Trial was without a jury and judgment was rendered sustaining appellee's claim of ownership of the horses involved.

Appellant's first point is that the court erred in vacating the default judgment.

Rule 727 provides, "If the plaintiff appears and the defendant fails to appear or neglects or refuses to join issue under the direction of the court or justice within the time prescribed for pleading, the plaintiff shall have judgment by default."

Rule 726 provides, "At the first term of court after the claim proceedings have been docketed in such court, and on the appearance day of such court, if both parties to the claim proceedings appear, then the court, or the justice of the peace, as the case may be, shall enter an order directing the making and joinder of issues by the parties. Such issues shall be in writing and signed by each party or his attorney. The plaintiff shall make a brief statement of the authority and right by which he seeks to subject the property levied on to the process, and it shall be sufficient for the defendant to make a brief statement of the nature of his claim thereto."

■ We believe that the trial court properly exercised its discretion in vacating the default judgment under the circumstances reflected by the sworn and uncontested motion filed by appellee.

Perhaps, appellee was not as diligent as she should have been in not making further inquiry concerning her case when she appeared, through her counsel, on the day for her appearance. However, the timely appearance of appellee's counsel certainly negates any conscious indifference to her case or any intentional disregard of it or the court. The default here was in the nature of a mistake as to the operation of a court whose judge had vacated the office. The court was properly presided over by another district judge of Travis County and appellee should have known that this was proper and might occur. As stated, however, we hold that the trial court had discretion and used it properly in vacating the default judgment.

■ Relying upon the rule stated in Craddock v. Sunshine Bus Lines, Inc., 134

Tex. 388, 133 S.W.2d 124 (1939), for setting aside default judgments, appellant contends the action of the trial court was improper because the motion to set aside did not allege a meritorious defense. Factually this is correct, however, under the peculiar rules applicable to this proceeding issue is not to be joined until directed to do so by the court after the appearance by the parties. Rule 726, supra. No such direction was given by the court here prior to rendition of the default judgment. Hence, if appellee's failure to appear in the proper court is excused, as we have held, there was no further basis for a judgment by default in these proceedings. Continental Oil and Gas Production Co. v. Austin, Banking Commissioner, 17 S.W.2d 1114, Tex.Civ.App. Eastland, n. w. h. (1926).

We overrule point one.

Appellant's second point is that the trial court erred in overruling his "Motion to Clarify." We quote the substance of this motion:

"Whereas, on the 31st day of January, 1968, after proper notice and hearing, the Court having heard the argument of counsel did enter an order that the parties to this suit join issue pursuant to Rule 726 TRCP, and it is plaintiff's desire that said order be clarified stating the time limits afforded the parties by law to join issues, and urges the court to set a joinder of issue as not later than Monday, 26 February, 1968 (being Monday next after 20 days), and as grounds for such would show the court, that even though no time limit is given in Rule 726 TRCP, Rule 729 TRCP says that 'the proceedings and practice on the trial shall be as nearly as may be the same as in other cases before such court or justice,' and since the maximum time given for appearance and answer before this court pursuant to Rule 101 TRCP is Monday next after the expiration of 20 days, plaintiff moves the Court to enter a clarification order as

outlined above, and that since this is an administrative matter, that this be granted ex parte without hearing."

This motion was overruled March 27, 1968.

Appellant filed his "Original Petition and Joinder of Issue" February 9, 1968. Appellee filed her "Original Answer" February 29, 1968. She filed an Amended Answer March 29, 1968.

■ It would have been better, in our judgment, for the court to have fixed a reasonable time for the parties to plead and to have specified such times in his order. The pleadings here were filed within a reasonable time after the parties were directed by the court to join issue. If there was any error here it was of a most harmless variety. This point is overruled.

The third point is that the pleadings of appellee were inadequate to join issue as directed by the court.

The first pleading of appellee on the merits was a general denial to the pleading filed by appellant. This pleading of appellee was held to be insufficient by the trial court and she was permitted to amend. In the amendment she pleaded, "Defendant would further show the Court that all of the horses which are the subject of this trial of right of property were the separate property of her granddaughter, Mrs. Ralph Arave, before and on the 24th day of February, 1966, and that these horses were transferred to defendant's ownership on the 24th day of February, 1966, and have continued to be defendant's property to this day."

■ We hold that this pleading was adequate to give appellant fair notice of the claim of appellee. Rule 45, T.R.C.P.

Appellant does not plead that he was surprised by this amendment and he did not seek a continuance.

We overrule point three.

Point four is that in finding the horses to be the separate property of appellee the trial court improperly weighed the evidence under the preponderance of the evidence rule rather than under the rule prescribed by Art. 4619, Vernon's Ann. Tex.Civ.St. before its amendment by Acts of 1967, 60th Leg., p. 738, ch. 309.

There were no findings of fact or conclusions of law requested of or filed by the trial court except as contained in its judgment. The judgment, in this respect, found and concluded, "the pleadings, the evidence and the argument of counsel having been heard and fully understood, the Court finds that all of the property, which is the subject matter of this controversy was the separate property of Mrs. Ralph Arave, before and on the 24th day of February, 1966, that Mrs. Ralph Arave transferred said property to defendant's ownership on the 24th day of February, 1966, and that defendant continued to be the owner of said property to this day, and that it appearing to the court that defendant has established her right to the property herein involved, it is therefore ORDERED, ADJUDGED AND DECREED that defendant has title and her right to possession of the property herein involved."

■ In the absence of any showing to the contrary, we presume that the trial court weighed the evidence by the proper rule. Point four is overruled.

Point five reads, "The failure of the court to consider the commingling of community property doctrine and the application of the tracing doctrine is erroneous."

■ The horses in suit were alleged to be the separate property of Mrs. Pat Arave, the wife of Ralph Arave and the granddaughter of appellee. We will discuss the evidence supporting the judgment finding these horses to have been the separate property of Mrs. Arave in disposing of the following point. We do not believe that this point has factual support in the record for it is not shown what "doctrines"

the court did or did not consider in reaching its judgment. This point is overruled.

The sixth point is, "The determination of the court that the horses were the wife's separate property is contrary to the evidence."

Whether this is a "no evidence" point or an "insufficient" evidence point, we do not know.

We quote the testimony of Mrs. Arave regarding the acquisition of each horse involved here:

### Cash Away

"A   Cash Away is a stallion that I got from J. B. Ferguson. I wanted the horse very much so Ralph brought him home and agreed to give him to me but any money that was paid on him was money that I got from my separate fund or from my grandmother.

Q   How much did you pay for the horse?

A   The purchase price was $750.00 but there still remains approximately $400.00 owed on the horse.

Q   And that leaves a balance of $350.00. Where did you get the money you used to pay for the horse so far?

A   Well, I had some separate funds. I was receiving $120.00 a month schooling allowance from the Government. My father died in World War II and I was entitled to this. I used some of that money for him and I got some of the money from my grandmother. That money was a gift, not a loan."

### Reno Idle and Rancho Queen

"A   She was bought at the Columbus sale along with Rancho Queen. At that time my grandmother wanted to buy me a kitchen. She wanted to give me a refrigerator and a stove and I bought these horses at

the sale and I called her and asked her if instead of buying me a refrigerator and a stove, if she would write me a check out for the amount of the purchase. And I have the cancelled check with me in the amount of $600.00.

Q   And that was the total for both Reno Idle and Rancho Queen?

A   For both of them."

### Miss Hygro

"A   Miss Hygro came from James Hemphill in Bastrop. When I got married I had $2,000.00 previous to marriage. I spent part of this money on a horse called Cash Profit and I traded Cash Profit for this mare."

### Lady Red

"A   She was given to me. She was an old brood mare no longer able to have colts, and at the time, I was teaching riding lessons, and rather than destroy the mare, he gave her to me."

### Cricket

"A   She was a grey Anglo-Arabian mare and she belonged to Courtney Johnson in San Antonio. I went to school with Courtney. The mare was blind in one eye and I had done some favors for Courtney and she asked me if I would take the mare and give her a good home. I have a letter from Courtney about that."

### Pere Wild Fire

"Q   Mrs. Arave, could you identify the funds that you used to buy this horse a little more specifically?

A   Yes, I was going to school under the GI Bill of Rights and I was getting $120.00 a month. When I didn't need that money for other

reasons I tried to put it in a savings account. I put only money that was mine and mine alone in the savings account so that I could keep track of it, or else I cashed the check and spent it on something usually for the horses. The breeding stock was my interest."

*One Sorrel Mare*

"Q The last horse listed is one sorrel mare and so far as I can see she is not identified.

A She's just a little—kind of a scrub mare that was given to me by Roy Stubbs. I helped him sell several horses and he asked me if I would take her and I took her as a gift."

Appellant refers to testimony that Mr. and Mrs. Arave had a joint bank account and that the funds of Mrs. Arave, claimed to be her separate money, were commingled with community funds and contends that this resulted in all such funds being community funds. We overrule this contention. Farrow v. Farrow, 238 S.W. 2d 255, Tex.Civ.App. Austin, n. w. h. (1951).

Appellant also directs attention to the testimony of appellee wherein she, at times, intimated that the money which she transferred to her granddaughter, Mrs. Arave, may have been a loan rather than a gift. Appellee was near eighty years of age and her testimony was not always clear or consistent. She and her husband did lend Mr. and Mrs. Arave money to purchase a home and this loan is evidenced by writings. There was no written evidence of any other debt. We quote some of the testimony of appellee:

"Q Mrs. Howard, what happened on February 24, 1966, as you remember it?

A Well, I don't remember. These horses were transferred but I didn't remember that it was the 24th of February. I have had a very, very ill husband, he has been ill with Parkinson's Disease, so I don't remember all those details.

Q Where were you when the bill of sale was signed?

A I was there. I signed it.

Q Was it signed at your suggestion?

A Well, I thought it should be.

Q Why?

A Well, I gave Patty the money for the down payment on the home and didn't accept any interest, and I felt surely because of all the money that I had given her, I had the cancelled checks,—I didn't know that I was coming here this morning until an hour or two before I started out so I didn't get near all the checks, but I do have the ones for the down payment on the house and a number of them that I gave Patty. I have given her, regularly, money.

Q You say 'gave,' were these gifts?

A Well, for the purpose of using on the horses.

Q Did you have any contract to have the money repaid to you?

A Well, we love each other in our home. As close as we are and I brought Patty up, and her father was killed in a bombing attack when she was a very little girl. Her mother and I together raised Patty and we love each other and we don't have to have anything written on paper.

Q You don't have to have any specific agreements, is that correct?

A Well, we had an agreement and they are always honored.

Q How specific are they, Mrs. Howard?

A Well, I don't have to go into that. We are all satisfied at our house.

Q Well, the question is; is there any specified date for repayment or method of repayment?

A I have made no specification but they repay us in many ways.

Q Then all of these monies then, are loans, is that correct?

A Patty has had to go through school and a great many other things, and she has worked in so many ways. She started in a very difficult way. As I said, she lost her father very early and then her mother married and the father that she had didn't discipline her like other people do. He broke her hand. That's what she went through, but she came out of it just fine. Then when she started with horses in a rodeo contest and she won $1,000.00 and she bought herself a horse and she paid for the keeping of the horse. And she has had a very difficult time."

Mrs. Howard testified that the Araves were not paying interest on the home loan. She also paid the feed bills for the horses. Mrs. Howard testified repeatedly, on cross examination that the money to buy the horses was given exclusively to her granddaughter, for instance:

"Q Let me state the question another way. Why didn't you give the gifts to her and to him too, why only to her?

A They were her horses and I felt an obligation. I gave to her and her alone. The horses were hers completely. The money each time was given to her.     .

Q Did you say on there 'for Patty and Patty only' on the check, or how did you—     .

A I wrote it to Patty Arave. Yes, to Patty and nobody else.

Q Did you call Ralph in and sit him down at the table and say, 'I want you to understand that these horses are Patty's and that this property is hers and not yours?'

A He understood that.

Q You didn't state it?

A Yes, I even told him that and he was very sweet about it. He's a wonderful man and I tell you, she's lucky to have him."

■ We overrule point six.

Appellant's last point is that the trial court erred in not setting aside the bill of sale from Mrs. Arave to appellee transferring the horses because such transaction was in fraud of himself as a creditor.

■ We overrule this point for the reason that it is not established in this suit that appellant is a creditor of Mrs. Arave. He is shown to be a creditor of Mr. Arave, only.

Finding no reversible error, the judgment of the trial court is affirmed.

Affirmed.